1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   KELLY LUNA, Plaintiff,                Case No.:  21cv1647-NLS

12   v.                                    **ORDER:**

13   KILOLO KIJAKAZI, Acting
     Commissioner of Social Security,      **(1)  DENYING PLAINTIFF'S**
14                                         **MOTION FOR SUMMARY**
                                          **JUDGMENT; and**
15                       Defendant.

16                                         **(2) AFFIRMING THE DECISION OF**
                                          **THE COMMISSIONER**
17

18                                         **[ECF No. 10]**

19

20          Plaintiff Kelly Luna ("Plaintiff") brings this action under the Social Security Act,

21   42 U.S.C. § 405(g), and seeks judicial review of a final decision by the Commissioner of

22   Social Security ("Commissioner") denying her application for social security disability

23   benefits under Title II of the Social Security Act.  Plaintiff filed a motion for summary

24   judgment, Defendant filed an opposition, and Plaintiff filed a reply.  ECF Nos. 10, 11,

25   and 12.

26          After considering the papers submitted, the administrative record, and the

27   applicable law, for the reasons set forth below, the Court **DENIES** Plaintiff's motion for

28   summary judgment, **AFFIRMS** the decision of the Commissioner, and **DISMISSES** this

action with prejudice.[1]

# I.     BACKGROUND

## A.     Procedural History

Plaintiff protectively filed a Title II application for Social Security Disability Insurance on December 4, 2019, in which she alleged disability beginning on October 31, 2019, due to cervical radiculopathy, multi-level cervical spondylosis, multi-level degenerative lumbar spine/facet arthropathy, chronic left and right leg pain/sciatica, right knee arthritis pain, and lumbar spine arthritis, severe right arm pain, neck and back nerve pain.  Administrative Record (AR) 51-51, 72.  The Commissioner denied Plaintiff's claim initially on February 21, 2020, AR 72, and on reconsideration on May 13, 2020. AR 80.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held by telephone on December 18, 2020, due to the coronavirus pandemic. AR 29-50.  Plaintiff testified at the hearing at which she was represented by counsel.  *Id.* An impartial vocational expert also testified at the hearing.  AR 46-49.

On February 26, 2021, the ALJ issued a decision denying Plaintiff's request for benefits.  AR 13-27.  On April 22, 2021, Plaintiff requested review of the ALJ's unfavorable decision.  AR 147.   The Appeals Council denied Plaintiff's request for review on August 26, 2021.  AR 1–6.  On that date, the ALJ's decision became the final decision of the Commissioner.  42 U.S.C. § 405(h).  Plaintiff timely commenced this action in federal court.

## B.     Plaintiff's Testimony and Self-Reported Symptoms

Plaintiff was 53 years old at the time of the administrative hearing.  AR 33.  She is married with two college age sons.  AR 45.  She testified that she has a bachelor's degree, and she was halfway through her master's degree when she had to quit school because her husband was deployed.  AR 33.  From 2005 through the first half of 2019, she

---

[1] The parties have expressly consented that all proceedings in this case may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 646(c); Fed. R. Civ.  P. 73; ECF No. 4.

worked for the Federal Bureau of Investigation ("FBI") as a human resources ("HR") specialist.  *Id.*  In June 2019, the FBI converted her job to an administrative specialist which entailed duties that differed from her previous position in HR.  AR 34.  Her work in HR was a desk job that involved benefits, personnel, hiring, recruiting, and payroll. AR 34.  There was no lifting involved.  *Id.*  She only worked a few months as an administrative specialist.  *Id.*  She took an early retirement from the FBI in December 2019, ostensibly because extreme pain prevented her from physically doing the work. AR 35, 46.

Plaintiff testified she is 5'6" tall and weighs about 230 pounds.  AR 35.  She has severe pain in her neck that radiates down through her right shoulder, arm and into her fingers.  AR 35-36.  She described the pain as being like "electricity that goes down into my arms."  *Id.*  She has had low back issues for over 20 years, but those were manageable until March of 2019.  AR 36.  But now, she has constant severe pain in her back that runs down both of her legs, with constant sciatica on the right side into her feet and intermittent sciatica into the left.  *Id.*  She also began having pain in her right knee in 2019 which occasionally caused her to stumble.  AR 37.  She started using a walking stick to prevent falling when her leg gives out.  *Id.*  She gets spasms in her hands and legs that cause them to go numb and make her drop things.  AR 38-39.  When her pain level gets beyond a level seven out of ten, she cannot function at all, mentally or physically. *Id.*  She also gets daily headaches for which she takes medication.  *Id.*  In addition to her orthopedic issues, she has had autoimmune problems for 30 years, including hypothyroidism, polycystic ovarian syndrome, chronic fatigue, and joint pain, and more recently, menopause.  AR 37.

Plaintiff treats her orthopedic pain with massage, acupuncture, physical therapy, aqua therapy, hypnotherapy, and a vibration machine.  AR 40-41.  She takes naps and medication (Zanaflex[2]) three to six times a day when the pain gets bad.  AR 42-43.

---

[2] Zanaflex is used to relieves spasms and tightness in the muscles caused by certain medical or spinal issues. It can cause drowsiness and sleepiness. www.mayoclinic.org/drugs-supplements/tizanidine-oral-

When she takes Zanaflex mid-day, it knocks her out anywhere from 60-120 minutes. *Id.* She also uses a "zero-gravity" massage chair and a "zero-gravity" bed to relieve her pain. *Id.* When she could not lie down during the day at work, she testified that she was literally crying because she "could not function, couldn't use her right leg, couldn't sit, couldn't stand, and couldn't drive to work because she was in so much pain." AR 43. It was "horrific." *Id.*

Plaintiff testified that she cannot type, use a mouse, or a phone without numbness and pain going down her arm. She can walk around the block for approximately 20 minutes a day after which she needs to lie down. AR 44. When she does laundry or dishes, she tries not to lift any weight because she tends to drop things. AR 44-45.

### C.   Medical Providers

Plaintiff has received most of her health care through Kaiser Permanente ("Kaiser"), where she has seen a variety of doctors and therapists for her medical problems. The ALJ considered the evidence and opinions from each of the relevant providers.

### 1.   Brandon McClellan, M.D. [Physical Medicine]

On March 19, 2019, Plaintiff saw Dr. Brandon McClellan following her Emergency Department visit the previous day, at which she complained of severe low back pain with radiating left leg symptoms. AR 263. He noted that she has a history of chronic low back pain. AR 263. His physical exam revealed normal range of motion in both legs and negative straight leg raising tests in both legs. AR 265. Her motor strength in both legs was rated 5/5 and she could squat, heel stand, and toe stand symmetrically. *Id.* Her reflexes and sensation were intact. AR 266. Dr. McClellan reviewed an MRI scan from December 2016 that documented multi-level degenerative changes in the lumbar spine, most pertinently a "disc herniation at L 5-S1 compressing the epidural space more left-sided than right." AR 267. Dr. McClellan ordered a follow-up MRI and

route/description/drg-20066921.  (June 1, 2022).

prescribed Naproxen 500mg twice a day for pain and inflammation.  AR 268.

On March 27, 2019, Dr. McClellan had a telephonic visit with Plaintiff following her MRI scan.  At that time, she reported her pain was "milder" and more "nagging."  *Id.*  The new MRI scan documented multi-level degenerative changes of the lumbar spine, including "severe left-sided neural foraminal narrowing at L5-S1 worsened when compared to 2016."  AR 271.

Dr. McClellan next saw Plaintiff for an office visit on May 2, 2019.  AR 273.  At that time, she complained of persistent knee pain lasting for several weeks.  *Id.*  She reported "working out and weight training at least four times a week."  AR 274.  She told Dr. McClellan she was caring for family members in poor health, caring for children, and juggling a demanding job.  AR 274-275.  She also told him she used to have Fridays off work, but her new supervisor might not allow that going forward.  AR 275.  Dr. McClellan documented his willingness to provide her a note so she could take care of family members along with her own care, including massage therapy and strengthening exercises at the gym.  *Id.*  An x-ray of her right knee showed no fractures, but there were mild degenerative changes in both knees.  AR 276-77.  However, a comparison with a 2010 x-ray showed no significant change.  *Id.*

On June 20, 2019, Dr. McClellan saw Plaintiff again.  At this visit, her primary complaint was of right arm pain radiating into her fingers.  AR 281.  She told Dr. McClellan she "[was] under extreme stress" as she was moved to a completely different job role after 23 years in the FBI.  *Id.*  Dr. McClellan's examination of the neck and cervical spine revealed mild tenderness in the cervical musculature, cervical range of motion within functional limits, and a negative Spurlings[3] sign on the right and left as well as a negative Hermitte's[4] sign.  *Id.*  His examination of the upper extremities showed

---

[3]The Spurling test is a highly specific provocative test used to diagnose a pinched nerve in the spine.  It is done by manipulating the head and neck manually to duplicate the pain the patient is feeling. www.webmd.com (June 23, 2021).

[4] In this test, the doctor flexes the patient's cervical spine.  If the patient feels a shock like pain down the

bilaterally negative Tinel's sign and Phalen's test.[5]  *Id.*  Plaintiff's range of motion was within normal limits bilaterally and a right shoulder impingement test was negative.  AR 282.  Plaintiff had no muscle atrophy, and her upper extremity motor strength was rated 5/5 bilaterally.  AR 283.  Deep tendon reflexes in her biceps, brachioradialis, and triceps were normal.  *Id.*  Balance and coordination were normal, and she had normal sensation on both sides.  *Id.*  There were no pathological reflexes on the Hoffman's test bilaterally.[6]  *Id.*

Dr. McClellan reviewed Plaintiff's new MRI scan from March 22, 2019.  AR 283.  That study showed moderate to severe central canal narrowing at L4-L5, as well as severe left-sided neural foraminal narrowing at L5-S1 that had worsened when compared to a 2016 MRI.  AR 284.  Dr. McClellan advised Plaintiff to continue treating with Naproxen and Aleve and to wear wrist splints at night.  AR 284.

Dr. McClellan had a telephonic appointment with Plaintiff on July 23, 2019, during which she reported ongoing radiating right arm pain and that her right knee locked up on her and caused her to fall.  AR 289.  Dr. McClellan gave her a referral for a cervical epidural steroid injection and a cervical MRI.  *Id*.  The cervical MRI in pertinent part showed multilevel cervical spine spondylosis and central canal stenosis that is worst at C6/C7, but with no frank cord compression or cord signal abnormality.  AR 291.  Neuroforaminal narrowing on the right at C6/C7 was moderate to severe with potential exiting nerve root compression.  *Id*.

Both Dr. McClellan and Dr. Alonso (a neurosurgery consultant) saw Plaintiff on October 28, 2019.  AR 295-301, 307-316.  Dr. McClellan noted in his records that Plaintiff did not plan to pursue surgery.  AR 308.  At that visit, Plaintiff complained of ongoing neck and right arm pain.  AR 308.  She told Dr. McClellan she had been offered

---

arms, this is indicative of a pinched nerve.  www.webmd.com (June 23, 2021).

[5] Tinel's sign and Phalen test are used to diagnose carpal tunnel syndrome. www.webmd.com (June 23, 2021).

[6] A positive Hoffman's reflex in the fingers may signify a neurological problem in the cervical spine or brain. https://www.healthline.com/health/hoffman-sign (September 18, 2018).

early retirement.  *Id*.  She also said that prednisone helped for her low back pain and left leg symptoms but did not help her arm symptoms.  *Id*.  Dr. McClellan reviewed her MRI scans and referred her for a repeat cervical epidural steroid injection and aquatic physical therapy for low back symptoms.  AR 314.  He also ordered a trial of nortriptyline for pain, but cautioned it could be sedating, so she should take it initially just at night.  AR 317.  He continued Plaintiff's Gabapentin, Zanaflex, Tylenol, and Aleve.  Dr. McClellan also referred Plaintiff for physical therapy, where she was treated once a week with cervical traction and a home exercise program.  AR 324-331.

Dr. McClellan had a phone call with Plaintiff on January 23, 2020.  AR 518.  She called to give him an update.  She reported that the aqua program at SD Sports Medicine was below average, so she switched to the YMCA's program with which she was doing "much better."  *Id.*  She advised that naps during the day along with aqua therapy and acupuncture have taken her pain from a 10+ to a 5-6.  *Id*.  She noted that the aqua classes were also helping with her lower back.  *Id*.

In a June 4, 2020, phone call to Dr. McClellan, Plaintiff advised that she had "reordered" Zanaflex because it helps with her pain and allows her to take a nap during the day.  AR 752.  She noted that with Covid she has been unable to get a massage or do pool therapy, so she purchased a massage chair and is working with her acupuncturist.  AR 753.  She related to him that the combination of daily aqua PT, biweekly massage, biweekly acupuncture, and daily naps with stretching keep her pain levels to "a somewhat manageable level."  AR 753-54.

On September 17, 2020, Plaintiff had an office visit with Dr. McClellan.  AR 1050-59.  On physical exam of the lumbar spine, he noted Plaintiff's range of motion was within normal limits.  AR 1053.  The straight leg raising test was positive on the right but negative on the left.  *Id*.  She had no muscle atrophy, and her motor strength was 5/5 bilaterally.  *Id.*  Regarding the cervical spine, there was some tenderness to palpation, but her range of motion was within functional limits.  *Id*.  The Phalen's test on the right induced muscle spasm.  AR 1054.  Upper extremity motor strength was 5/5 on the left

and either 4/5 or 5/5 on the right. *Id*. Reflexes were absent in the triceps tendon on both sides. *Id*. Sensation was normal bilaterally in the lower and upper extremities. *Id*. Dr. McClellan reviewed Plaintiff's cervical and lumbar MRI scans from 2019. AR 1056-57. He assessed Plaintiff at that time as having chronic neck pain, right-sided cervical radiculopathy, chronic low back pain with right lower lumbar radiculopathy. AR 1058. He noted that she has found Zanaflex quite helpful as well as changing positions and laying down for periods throughout the day. *Id*. He recommended she maintain her current regimen of aquatic exercise, massage therapy, vibration therapy, cupping, and acupuncture. *Id*.

On September 25, 2020, Dr. McClellan wrote a "to whom it may concern" letter for Plaintiff. AR 1135. In the letter, he says he has been treating Plaintiff since March of 2019 for chronic neck pain, right-sided cervical radiculopathy, chronic low back pain with right lower radiculopathy and chronic muscle spasms. *Id*. Dr. McClellan goes on to say that Plaintiff's imaging studies correlate well with her symptoms. He relates that the cervical MRI demonstrates significant spondylosis with multi-level moderate to severe central and foraminal stenosis including likely impingement on her C7 nerve. Her lumbar spine MRIs show multi-level fair-to-severe degenerative changes which have progressed. *Id*. She also has moderate to severe central stenosis at L4/5 and severe left foraminal narrowing at L5/S1. *Id*. Dr. McClellan indicates that Plaintiff's pain can be "quite diffuse," and she has done a "tremendous job" trying to manage her symptoms with myriad active and passive treatments. *Id*. He notes that despite these activities her condition worsened to the point where she had to retire for medical reasons. *Id*. He says she experiences pain with any kind of prolonged activity. She cannot sit for more than 10-20 minutes at a time without needing to change positions or ideally to lie down. *Id*. With daily aquatic aerobics, she can keep herself moving and functionally independent. She does acupuncture, massage, cryotherapy, vibration therapy, and hypnotherapy. She also gets medications and injections. She must lay down throughout the day to manage her pain. *Id*. Dr. McClellan concludes by saying she will likely have to continue with

these therapies and treatments "indefinitely" to maintain her independence. *Id.*

### 2.   Fernando Enrique Alonso, M.D. [Neurosurgery consultant]

On October 28, 2019, Dr. Fernando Enrique Alonso, a neurosurgeon, evaluated Plaintiff for right upper extremity cervical radiculopathy.  He noted her complaint of right arm pain radiating into her fingers and her history of lumbar radiculopathy.  At that time, Dr. Alonso noted that "the patient denies dropping objects, changes or loss of dexterity, inability, or difficulty with writing, typing, or buttoning clothes."  AR 295.  She also "denied gait instability or slowness, the need for a cane or walker or recent falls."  *Id.* She similarly denied motor weakness, bowel, or bladder incontinence.  AR 296.  Her medications included Zanaflex for muscle spasms, Neurontin, Prednisone, and Aleve. AR 297.  After reviewing her cervical MRI, Dr. Alonso diagnosed multilevel cervical spinal stenosis at the C5-C7 levels with potential nerve root compression.  He told her if she wanted to proceed with surgery, the surgery would possibly include a fusion with instrumentation.  AR 301.  Regarding the lumbar spine, Dr. Alonso had a frank discussion with Plaintiff about weight loss.  He did not recommend lumbar surgery at that time.  *Id.*

### 3.   Carolyn Smyth, DACM/LAc

Plaintiff began acupuncture treatment with Dr. Carolyn Smyth on October 28, 2019.  AR 460.  At the first visit, Plaintiff reported right arm pain at 10/10.  After a one-hour treatment with acupuncture, Plaintiff reported a reduction in pain.  *Id.*  Dr. Smythe's treatment plan included acupuncture and cupping once a week for 6 weeks, then bi-weekly appointments for 12 weeks.  Dr. Smythe's goal was to reduce the pain to a 4/10 after 12 treatments.  *Id.*

At her next appointment with Dr. Smythe on November 2, 2019, Plaintiff reported a reduction in pain to 8/10.  On November 6, 2019, Plaintiff reported a further reduction in pain to 7/10.  AR 461.  On November 12, 2019, Plaintiff reported pain at 7/10 with relief from pain for two days after treatment as well as pain and numbness in the arm when she sits for long periods of time.  AR 462.  On November 19, 2019, Plaintiff

reported her pain level was 6/10.  AR 463.  She reported that same pain level on December 7, 2019.  *Id.*  By January 4, 2020, Plaintiff's reported pain level was 5/10.  AR 464.  She reported that same pain level at her visit on January 16, 2020.  *Id.*  She also said her pain level had decreased since she stopped working.  *Id.*  On February 20, 2020, Plaintiff reported a pain level of 4/10 with relief from pain for four days after a treatment.  AR 465.  On February 15, 2020, she reported a 4/10 pain level and an increase in mobility of the arm and frequency of range of motion exercises.  *Id.*  By February 29, 2020, Plaintiff's reported pain level was 3/10 with relief from symptoms for five days after treatment.  AR 466.  On March 28, 2020, Plaintiff's pain had increased to 6/10 because she had not been to acupuncture, massage, or water therapy in a month due to the stay-at-home order.  *Id.*  On April 4, 2020, Plaintiff reported her pain level at 5/10.  Dr. Smythe told her to return bi-weekly and try doing yoga and stretching at home.  AR 467.  On April 13, 2020, Plaintiff's reported pain level was again 5/10.

4.   **Adrienne Moore Kelly [Primary Care Physician]**

Plaintiff saw Dr. Kelly on September 9, 2020, for the purpose of getting letters confirming her diagnosis and functional limitations as she was trying to get disability retirement.  AR 997.  Dr. Kelly noted Plaintiff's longstanding issues with cervical radiculopathy, lumbar radiculopathy with sciatica as well as bilateral osteoarthritis in the knees.  She also observed that Plaintiff had been actively followed by Physical Medicine for these issues.  AR 998.  Dr. Kelly reported that Plaintiff's neck pain radiates down her right arm and any range of motion causes shooting pain with numbness to the fingers.  AR 996.  The pain makes it difficult to do computer work and significantly interferes with her activities of daily living (cleaning, cooking and even bathing).  AR 998.  Dr. Kelly noted that x-ray and MRI scans confirm cervical canal stenosis and further opined that surgery is not likely to help her symptoms.  *Id.*  Regarding the low back, Dr. Kelly noted that MRI scans confirm multilevel degenerative changes of the lumbar spine and severe central canal narrowing that has progressively worsened.  Sitting or standing for any length of time exacerbated her back pain or sciatica.  *Id.*  Dr. Kelly noted that

Plaintiff says "she pretty much does physical therapy all day long.  She has a zero-gravity chair and bed and can get her pain down to 8/10 if she takes a muscle relaxant and a nap every day."  AR 998.  Plaintiff told Dr. Kelly that since October 2019, she gets massages and acupuncture every two weeks, and she also does aquatic therapy at the YMCA.  *Id.*  Dr. Kelly noted on physical examination that Plaintiff has pain with straight leg raising on the right, no atrophy, decreased patellar tendon reflexes on both sides, pain with abduction of the right arm and spasm in the cervical spine and lower lumbar region.  AR 999.  In her assessment of Plaintiff, Dr. Kelly included cervical radiculopathy, lumbar radiculopathy, sciatica on the right side, osteoarthritis of both knees, and severe obesity.[7]  AR 1000.  Dr. Kelly told Plaintiff to follow up with her physical medicine doctor for a letter supporting her diagnosis and functional limitations.  AR 997, 1000, 1045.

On September 21, 2020, Dr. Kelly wrote a "to whom it may concern" letter that documented her assessment of Plaintiff's medical issues and functional limitations.  AR 1131-1132.  She documented a longstanding history of pain and numbness in Plaintiff's upper and lower right extremities due to cervical and lumbar spondylosis and radiculopathy.  *Id*.  Dr. Kelly goes on to observe that Plaintiff's cervical stenosis (confirmed on MRI) causes severe radiating pain down her right arm.  The pain, she noted, limited her ability to perform activities of daily living such as cooking, cleaning, bathing, and computer activities.  AR 1131.  Steroid injections have been ineffective, and surgery is not indicated due to multi-level involvement.  *Id*.  Regarding the low back, Dr. Kelly noted a longstanding history of low back pain and a 2019 MRI scan that confirms multi-level degenerative changes and central canal stenosis.  *Id*.  She stated that sitting or standing for any length of time exacerbates Plaintiff's back pain or sciatica.  She also gets significant cramping when she stands or walks.  *Id*.  Dr. Kelly noted that Plaintiff treats the pain with physical therapy most of the day along with using a zero-gravity chair and bed.  *Id*.  She also related that Plaintiff gets massage and acupuncture every two weeks.

---

[7] At the time of that examination Plaintiff was 5'6" tall and weighed 250 lbs.

Based on her symptoms and limitations, Dr. Kelly opined that plaintiff is unable to work. AR 1132.

Along with the letter she wrote for Plaintiff, Dr. Kelly completed a medical information questionnaire for the Social Security Administration.  AR 1132-1134.  In that questionnaire, Dr. Kelly opined that Plaintiff's level of functioning is for "sedentary work," but even sedentary tasks that involve sitting or using her right arm can increase her symptoms of pain and numbness.  AR 1133.  Dr. Kelly says it is medically necessary for Plaintiff to use her zero-gravity chair and bed at 15 to 20-minute intervals during the day to reduce her level of pain.  *Id.*

### 5.      Dr. Sophia Chang, DACM/LAc

Dr. Chang wrote a letter on Plaintiff's behalf dated November 11, 2020.  AR 1137. In it, she noted that she has been treating Plaintiff since October 11, 2020.  She detailed Plaintiff's multiple orthopedic issues and chronic debilitating pain, which she says is supported by cervical and lumbar MRI scans.  *Id.*  Like Dr. McClellan, Dr. Chang stated that Plaintiff's symptoms require her to lay down several times a day and take naps to control her pain.  Dr. Chang's treatment plan for Plaintiff was to continue acupuncture 1-2x per week.  She said Plaintiff's condition is indefinite and irreversible and will only worsen if she does not maintain her current therapies and treatments.  *Id.*

### D.      Vocational Expert Testimony

A vocational expert, Stephen Davis, testified at the administrative hearing. AR 46-49.[8]  Mr. Davis testified that Plaintiff's prior work as a Human Resources Specialist, code 166.267-038,[9] would be considered medium, sedentary work as she performed it, SVP 7.[10]

---

[8] Mr. Davis has a master's degree in counseling psychology and is board certified by the American Board of Vocational Experts.  He has extensive experience in workers' compensation, long-term disability, short-term disability, and Social Security Disability.  AR 238-40.

[9] The "codes" referred to by the vocational expert refer to the Dictionary of Occupational Titles (DOT), U.S. Department of Labor-Fourth Edition, Revised. 1991.

[10] To determine the skill level of various jobs, the SSA uses a Specific Vocational Preparation (SVP) rating.  The rating indicates how much time it takes for a worker to learn a job. An SVP rating of 7

The ALJ engaged in the following colloquy with Mr. Davis:

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q: In this case we have two hypotheticals.  First, assume a hypothetical claimant, age 52 at the alleged onset date, with 16 plus years of education, the past work: the one job previously described.  In the first hypothetical, let's opine that this hypothetical claimant can lift and carry 20 pounds occasionally, ten pounds frequently; can stand or walk for at least six hours out of eight; sit for at least six hours out of eight; should never climb ropes, ladders, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to extreme cold, vibration, unprotected heights, and moving and dangerous machinery.  Give those restrictions and those alone, could this hypothetical claimant return to any past relevant work?

A: Yes, Your Honor.  The job could be performed as defined and would be able - - to be able as she performed it.

Q:  Ok, and our second hypothetical is similar to the first except it's ten pounds occasionally, less than ten pounds frequently; stand or walk for up to two hours out of eight; sit for at least six; everything else stays the same and this hypothetical claimant would have the option to use a handheld device that's - -as a cane or a walking stick to get to and from the work area.  Would this allow for a return to past work?

A. Yes, sir.

Q:  Okay.  And as far as using a cane or a walking stick in the work area, that's something that's not covered by the DOT; is that correct?

A. That's correct, Your Honor.

Q: And is that based on your experience and education?

A: 40 plus years' experience doing job analysis and seeing how it can impact on the ability to perform effectively, Your Honor.   So, yeah, it's based on my experience.

Q:  And so, you're supplementing the DOT then, rather than conflicting with it.  Is

---

translates to up to seven months training to learn the job. SSA Grid Rules: Understanding Specific Vocational Preparation. https//disabilityqualification.com (June 10, 2021).

that a fair statement?

A: That's correct. For the cane, Your Honor.

Q: And has your testimony today been consistent with the DOT and <u>Selected Characteristics of Occupations</u> other than the instance of supplementation?

A: That's correct. Everything else is consistent with the DOT except for the cane, Your Honor, which is based on my experience.

ALJ: Okay. Questions counsel?

ATTY; Thank you, Judge.

BY ATTORNEY:

Q: Mr. Davis, back to hypothetical number two, if you'd also add the restriction that the claimant needs to lie down for pain relief, which results in her being off-task approximately two hours through the course of the workday, does that affect the past work?

A: Well, that eliminates all work.

AR 47-49.

## II.    THE ALJ DECISION

### A.    The Sequential Process

To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months. 42 U.S.C. §§ 423(d), 1382(c)(a)(3). The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b). If not, then at step two the

ALJ must determine whether the applicant suffers from a severe impairment or a combination of impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(c). If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* §§ 404.1520(a)(4)(iii), 416.920(d). If the applicant's impairment meets or equals a listing, he or she must be found disabled. *Id.*

If the impairment does not meet or equal a listing, the ALJ must determine the applicant's residual functional capacity ("RFC"). [11]  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e). Then, the ALJ must determine at step four whether the applicant retains the residual functional capacity to perform past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(f). If the applicant cannot perform past relevant work, at step five the ALJ must consider whether the applicant can perform any other work that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

The applicant carries the burden to prove eligibility from steps one through four but the burden at step five is on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits. *Id.*

## B.    Substance of the ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 31, 2019, the alleged onset date. AR 15.

At step two, the ALJ determined Plaintiff has the following severe impairments: degenerative disc disease of the lumbar and cervical spines with radiculopathy; degenerative joint disease in the right knee; and obesity. *Id.* The ALJ determined that those listed medically determinable impairments significantly limited her ability to perform basic work activities as required by SSR 85-28. The ALJ noted that the medical evidence showed Plaintiff has a history of headaches, skin problems, diverticulitis, hypothyroidism, and hyperlipidemia. However, he determined those conditions do not

---

[11] A claimant's residual functional capacity ("RFC") is the most she can still do in a work setting despite impairments. See, 20 C.F.R. § 404.1545(a).

more than minimally interfere with her ability to perform basic work activities and therefore are not severe.  AR 15.

At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments. AR 17.

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) in that:

> The claimant can lift and carry 20 pounds occasionally and ten pounds frequently.  She can stand and/or walk for six hours out of an eight-hour day; can sit for six hours of an eight-hour day; never climb ropes/ladders/scaffolds; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold, vibration, unprotected heights and moving and dangerous machinery.

*Id.*  In making his RFC assessment, the ALJ noted he had considered the entire medical record, including Plaintiff's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence, as well as the medical opinion and other opinion evidence.

At step four, the ALJ determined that Plaintiff can perform her past relevant work as a human resource specialist as it is actually and generally performed in the national economy.  AR 24.  The ALJ noted that the vocational expert testified that someone with the claimant's age, education, work experience, and residual functional capacity could perform this past relevant work.  *Id.*  The expert also testified that claimant's job would remain sedentary and would allow the claimant to use a handheld device to get to and from the workstation.  This work does not require performance of work-related activities precluded by the claimant's residual functional capacity.  *Id.*

In sum, the ALJ found Plaintiff was not disabled as defined in the Social Security Act as any time from October 31, 2019, the alleged onset date, through the date of his decision.  AR 24.

III.   **LEGAL STANDARD OF REVIEW**

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits.  42 U.S.C. § 405(g).  A reviewing court will set aside a denial of benefits only when the ALJ decision is "based on legal error or not supported by substantial evidence in the record."  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (*quoting Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)).  Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted).  It is a "highly deferential" standard of review.  *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009).  However, the Court must consider the entire record, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and it "may not affirm simply by isolating a specific quantum of supporting evidence."  *Garrison v. Colvin*, 759 F3d. 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted).  If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld.  *Molina*, 674 F.3d at 1111.  It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff.  *Batson*, 359 F.3d at 1193.  Moreover, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ.  *Molina*, 674 F.3d at 1121.

## IV.    DISCUSSION

Plaintiff argues that the ALJ erred in three respects: (1) by failing to give clear and convincing reasons for rejecting Ms. Luna's symptom testimony by using her extensive treatment regimen to undermine her credibility, (2) by failing to provide sufficient reasons supported by substantial evidence for rejecting the opinions of Dr. Kelly and Dr.

McClellan, and (3) by failing to consider the side effects of Ms. Luna's medications in determining her RFC.  The court is not persuaded by any of these arguments.

A.   **The ALJ properly evaluated plaintiff's subjective symptom testimony and made findings that are supported by substantial evidence.**

Plaintiff first argues that the ALJ erred in discounting her subjective symptom testimony.  The Commissioner contends that the ALJ properly applied the two-step process in considering Plaintiff's alleged symptoms and made findings that are properly supported by the record and sufficiently specific to ensure that he did not "arbitrarily discredit" her subjective testimony.  *See Thomas v. Barnhart*, 278 F.3ed 947, 958 (9th Cir. 2001) (*citing Bunnel v Sullivan*, 947 F.2d 341-345-46 (9th Cir. 1991)).

Both the Act and the regulations prohibit granting disability benefits based solely on a claimant's subjective complaints.  42 U.S.C. § 423(d)(5)(A) ("[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").  As one court observed, the ALJ "is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The Ninth Circuit has established a two-step process to determine whether a claimant's testimony about subjective pain is credible.  *Kramer v. Kijakazi*, Case No. 20cv2065-GPC (AHG), 2022 WL 873630 *11 (S.D. Cal. March 24, 2022) (*citing Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-1036 (9th Cir. 2007)).  First, the ALJ must determine whether the claimant provided objective evidence of an impairment or impairments that could reasonably be expected to produce the alleged pain or symptoms.  *Id.* at 1036.  Second, if the first factor is met and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific clear and convincing reasons for doing so."  *Id*.

"While subjective pain testimony cannot be rejected solely on the ground that it is not fully corroborated by objective medical evidence, the medical evidence is nevertheless a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Kramer*, 2022 WL 873630 *11 (*citing Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)).  "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, . . . and 'whether the claimant engages in daily activities inconsistent with the alleged symptoms.'"  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Following the two-step process, the ALJ determined first that Plaintiff's medically determinable impairments (*i.e.*, degenerative disc disease of the lumbar and cervical spines with radiculopathy; degenerative joint disease in the right knee; and obesity) could reasonably be expected to cause some of her alleged symptoms (*i.e.*, daily pain in her neck and shoulders that radiates to her arms and fingers along with muscle spasms and low back pain with sciatica that radiates into her right leg).  AR 15, 17, and 18.

Having satisfied the first step of the process, the ALJ next found that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the objective medical evidence in the record.  AR 18. For example, the ALJ noted that "[t]here was no evidence of atrophy on September 9, 2020, which would be consistent with a significant limitation of extremity use." AR 18 (citing AR 999)  The ALJ also observed that despite Plaintiff's complaints of severe pain, "the physical examination noted normal gain and posture," specifically noting "mild tenderness in the cervical spine with some tender knots in the right trapezius, but cervical range of motion within functional limits, she had negative Spurling's sign, negative L'Hermitte's sign, negative Tinel's sign, and negative Phalen's test on the left although it was positive on the right."  AR 19 (citing AR 282).  The ALJ noted Plaintiff had normal range of motion throughout the shoulders bilaterally, normal motor strength in the bilateral upper extremities, no muscle atrophy, intact sensation, normal deep tendon

reflexes, and normal balance and coordination. AR 19 (citing AR 282-83). The ALJ further observed that while Plaintiff claimed she was limited to lifting and carrying almost no weight and could only walk one block without pain or numbness, those claims were inconsistent with other evidence in the record that showed she was not precluded from performing all such activities. AR 18. For example, Dr. Alonso, the consulting neurosurgeon, noted that "the patient denies dropping objects, changes or loss of dexterity, inability, or difficulty with writing, typing, or buttoning clothes." AR 295. She also "denied gait instability or slowness, the need for a cane or walker or recent falls." AR 297.

Additionally, at her visit with Dr. McClellan in May 2019, Plaintiff reported "working out and weight training at least four times a week." AR 274. She told Dr. McClellan she was caring for family members in poor health, caring for children, and juggling a demanding job. *Id.* These activities are inconsistent with her complaints of severe, constant, disabling pain.

Finally, the ALJ reasonably concluded that Plaintiff's conservative course of treatment was inconsistent with the extreme limitations she alleged. AR 18. He observed that the treating notes indicate she was able to manage her pain with conservative treatment through acupuncture, massage, physical therapy, and medication. *Id.*; *see Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir. 1995) (conservative course of treatment suggested "a lower level of both pain and functional limitation"). In 2019, Plaintiff repeatedly told her doctors that she was able to control her back pain with a combination of exercise, Epsom salts, stretching, cryotherapy, massage, and hot yoga. AR 18 (citing AR 263, 518, 664, 750). She also reported to her doctor in January 2020 that aqua therapy, acupuncture, medication, and naps reduced her pain level significantly. AR 664, 750.

In sum, the Court concludes that the ALJ provided specific, clear, and convincing reasons to discount Plaintiff's symptom testimony. Where, as here, the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be

upheld. *Molina*, 674 F.3d at 1111. It is not the Court's role to re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 359 F.3d at 1193; *see also Thomas*, 278 F.23d at 959 ("[i]f the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing.").

### B.    The ALJ did not err in discounting the opinions of Dr. Adrienne Kelly and Dr. Brandon McClellan.

Plaintiff's second argument is that the ALJ committed error by failing to provide sufficient reasons supported by substantial evidence for rejecting the opinions of Plaintiff's treating physicians, Drs. Kelly and McClellan.

On January 18, 2017, the Social Security Administration ("SSA") revised the regulations that apply to evaluation of medical evidence, effectively abolishing the so-called "treating physician rule" for cases filed on or after March 27, 2017. As both parties acknowledge, this changed regulation applies to Plaintiff's case. ECF 10 at 11, ECF 11 at 6-7.

Under the revised regulations, the previous hierarchy of medical opinions was eliminated, meaning that an ALJ no longer must assign a certain weight to a medical practitioner's opinion. Rather, ALJs are now to "consider" the "persuasiveness" of opinions from all medical sources. 20 C.F.R. §§ 404.1520c(a); 416.920c(a).[12]

The ALJ is now required to focus on the persuasiveness of a medical opinion or prior administrative finding(s) using the following five factors:

(1)    Supportability

(2)    Consistency

---

[12] For Social Security applications filed before March 27, 2017, the medical opinion of a treating physician was given controlling weight so long as it was well-supported by medically acceptable clinical and laboratory techniques and was not inconsistent with the other substantial evidence in claimant's medical record. *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 CFR §§ 404.1527(c)(2)).

1      (3)     Relationship with the claimant (including):

2             a.     Length of treatment relationship

3             b.     Frequency of examinations

4             c.     Purpose of the treatment relationship

5             d.     Extent of the treatment relationship

6             e.     Examination relationship

7      (4)     Specialization

8      (5)     Other factors

9    20 C.F.R. § 404.1520c(a)-(c) (2017).

10      Supportability and consistency are the two most important factors to be considered

11 by the ALJ in determining the persuasiveness of a medical source's opinion.  20 C.F.R.

12 § 404.1520c(b)(2).  The ALJ must explain in his decision how persuasive he finds a

13 medical opinion based on these two factors.  *Id.*  The ALJ may, but is not required to,

14 explain how he considered the other remaining factors, unless the ALJ finds that two

15 medical opinions on the same issue are equally well supported and consistent with the

16 record, but are not identical.  20 C.F.R. § 404.1520c(b)(2).

17      Here, the ALJ found that Dr. Kelly's opinion was not supported by or consistent

18 with the evidence in the record.  AR 22.  Dr. Kelly's narrative letter in support of

19 Plaintiff's disability claim, AR 1131-1132, described Plaintiff's history of neck and back

20 pain and concluded that those chronic issues rendered her unable to work.  *Id.*  In

21 Dr. Kelly's opinion, Plaintiff's spondylosis and central canal stenosis, which were

22 confirmed on MRI, caused Plaintiff severe radiating pain down her right arm.  Dr. Kelly

23 related Plaintiff's complaint that any range of motion involving her arm causes "shooting

24 pain down to her fingertips."  AR 1131.  Dr. Kelly opined that due to the severity of her

25 symptoms, Plaintiff's activities of daily living (*e.g.*, cooking, cleaning, bathing) and

26 computer activities were significantly limited.  *Id.*  Dr. Kelly also noted that steroid

27 injections have been ineffective, and surgery is not indicated due to multi-level

28 involvement.  *Id.*

Regarding the low back, Dr. Kelly noted Plaintiff's longstanding history of chronic low back pain and stated that was consistent with a 2019 MRI depicting multi-level degenerative changes and central canal stenosis that is progressively worsening.  AR 1131.  Dr. Kelly indicated that sitting or standing for any length of time exacerbates Plaintiff's back pain or sciatica and that she also gets significant cramping when she stands or walks.  *Id.*  Dr. Kelly observed that Plaintiff treats her pain with physical therapy "for the majority of the day."  *Id.*  Additionally, she used a zero-gravity chair and bed at 20-minute intervals during the day, along with a muscle relaxer.  *Id.*  Dr. Kelly went on to note that Plaintiff gets massage, aqua therapy, and acupuncture every two weeks which she has done since October 2019.  Based on her symptoms and limitations, Dr. Kelly opines that Plaintiff is unable to work.  AR 1132.

The ALJ found Dr. Kelly's opinion unpersuasive because it was not supported by or consistent with the record as a whole.  He noted that physical examinations of Plaintiff did not reveal significant neurological defects.  Rather, she had generally normal motor strength in the upper and lower extremities.  AR 22 (citing AR 299, 310-311).  The ALJ found that this was consistent with Plaintiff's own report to the neurosurgeon, Dr. Alonso, in which she denied dropping objects, changes or loss of dexterity, inability to write or type, gait instability, the need for a cane, motor weakness or incontinence.  AR 295-296.  Despite her subjective complaints of pain, Dr. Kelly's notes on physical exam indicated Plaintiff had no muscle atrophy, she had intact varus and valgus strength, and she was able to walk without assistance.  AR 22 (citing AR 999).  Dr. Kelly did indicate that Plaintiff had pain with straight leg raising on the right, decreased patellar tendon reflexes on both sides, pain with abduction of the right arm and spasm in the cervical spine and lower lumbar region.  AR 999.  Despite these positive findings, the ALJ reasonably concluded that Dr. Kelly's opinion regarding Plaintiff's functional capacity should be discounted due to the lack of objective evidence of significant neurological involvement and because Dr. Kelly was not treating Plaintiff for the problems she claims are disabling.  AR 22 (citing AR 989).  Further, the ALJ's opinion appropriately

addressed supportability and consistency, as required under the regulations.

The ALJ similarly found Dr. McClellan's opinion unpersuasive as it was not supported by and consistent with the medical record as a whole.  AR 22-23.  On September 25, 2020, Dr. McClellan wrote a "to whom it may concern" letter for Plaintiff.  AR 1135.  In the letter, he said he has been treating Plaintiff since March of 2019 for chronic neck pain, right-sided cervical radiculopathy, chronic low back pain with right lower radiculopathy and chronic muscle spasms.  *Id.*  Dr. McClellan went on to say that Plaintiff's imaging studies correlate well with her symptoms.  He said that the cervical MRI demonstrates significant spondylosis with multi-level moderate to severe central and foraminal stenosis including likely impingement on her C7 nerve.  *Id.*

Regarding the lumber spine, Dr. McClellan noted Plaintiff's MRIs show multi-level, fair-to-severe degenerative changes which have progressed.  *Id.*  She also has moderate to severe central stenosis at L4/5 and severe left foraminal narrowing at L5/S1.  *Id.*  Dr. McClellan indicated that Plaintiff's pain can be "quite diffuse," and she has done a "tremendous job" trying to manage her symptoms with myriad active and passive treatments.  *Id.*  He noted that despite her efforts, her condition worsened to the point where she had to retire for medical reasons.  *Id.*  He said she experiences pain with any kind of prolonged activity.  She cannot sit for more than 10-20 minutes at a time without needing to change positions or ideally lie down.  *Id.*  With daily aquatic aerobics, she can keep herself moving and functionally independent.  She does acupuncture, massage, cryotherapy, vibration therapy, and hypnotherapy.  She also gets medications and injections.  She must lay down throughout the day to manage her pain.  *Id.*  Dr. McClellan concluded by saying she will likely have to continue with these therapies and treatments "indefinitely" to maintain her independence.  *Id.*

On review of Dr. McClellan's letter opinion, the ALJ found that his statements merely repeated Plaintiff's history and relied too heavily on her subjective complaints rather than objective evidence.  AR 23.  Dr. McClellan's physical examination, by comparison, revealed that Plaintiff had normal gait, normal range of motion in the lumbar

spine, normal motor strength in both the upper and lower extremities, no atrophy, substantially normal reflexes, and bilaterally intact sensation in the upper and lower extremities. *Id.* (citing AR 263-266, 281-283, 1050-1059). The ALJ also observed the record contained no evidence of any electrodiagnostic testing that would confirm the diagnosis of radiculopathy. AR 23. Additionally, the ALJ observed that claimant was able to manage her symptoms with conservative treatment. *Id.* Because these were valid reasons for discounting Plaintiff's complaints of disabling pain, they are equally valid reasons for rejecting Dr. McClellan's opinion. *See Tommasetti*, 533 F. 3d at 1041 ("An ALJ may reject a . . . physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.").

The ALJ also reasonably considered the opinions of the state agency doctors who opined that Plaintiff had significantly less functional limitation than she claims. For example, Dr. Hedge and Dr. Steinsapir (state agency reviewers) both found Plaintiff to be only limited to light work with some postural limitations. AR 21, 56-57, 65-68. After recounting the many "normal" findings on Plaintiff's physical examinations, the ALJ found these opinions persuasive because they were supported and consistent with the record as a whole. AR 21.

In sum, the Court finds that the ALJ did not err in discounting the opinions of Dr. Kelly and Dr. McClellan.

### C.     The ALJ correctly determined Plaintiff's Residual Functional Capacity

Plaintiff's third and final argument is that the ALJ erroneously failed to consider the side-effects of her medications when determining her residual functional capacity, citing Social Security Ruling (SSR) 16-3 and *Varney v. Secretary of Health and Human Services*, 846 F.2d 581-585 (9th Cir. 1988) (holding that if the Secretary chooses to disregard side effects of a claimant's medications, he must support that decision with specific findings). ECF 10 at 16-17. However, the Court finds that here, the ALJ did discuss Plaintiff's medications throughout his decision, noting that her symptoms were mostly relieved with her current treatment regimen. AR 21-22.

The only side effect of medications Plaintiff did report was that Zanaflex makes her sleepy.  AR 43.  She had previously told her doctors that she intentionally took that medication at lunchtime, so she could nap.  AR 661, 1051.  She testified at the administrative hearing that when she takes Zanaflex at mid-day it "knocks her out" from 60 to 120 minutes.  AR 43.  While the ALJ did not specifically make a finding on the side effect of Plaintiff napping for 1-2 hours a day, this side effect is essentially the same as other testimony that the ALJ did consider.  For example, the ALJ specifically noted in his opinion that Plaintiff "laid down during the day for one to hours at a time" and that she "alleged spending approximately two to four hours a day lying in bed."  AR 18.  As discussed above, the Court concluded that the ALJ properly evaluated plaintiff's subjective symptom testimony.  Where the side effects from the medicine are "essentially the same" as the other general symptoms that Plaintiff already testified about, it is not error if the ALJ fails to specifically mention the side effects in his opinion.  *See Muhammed v. Apfel*, No. C 98-02952 CRB, 1999 WL 260974, at *8 (N.D. Cal. Apr. 2, 1999) (where "Plaintiff's side effects [of dizziness and headaches] were essentially the same as her general symptoms such as, dizziness, flushed face and feeling tired," "it is reasonable to conclude that the ALJ's explicit specific findings regarding Plaintiff's subjective complaints of pain and symptoms implicitly constitute determinations as to the medicinal side effects" and thus, "as required by *Varney*, the ALJ did address the Plaintiff's side effects in his findings").

Other than the side effect of "sleepiness" from Zanaflex, the record contained no other statements regarding limitations caused by medications.  No doctor or other health care provider suggested that this medication would adversely affect Plaintiff's ability to work.  *See Thomas v. Barnhart,* 278 F.3d 947, 960 (9th Cir. 2002) (although claimant contended the ALJ erroneously excluded the side effects of her pain medications, she offered no objective evidence that her medications affected her concentration or caused dizziness, and the only evidence offered regarding these symptoms were her own statements to her doctor); *see also Roquemore v. Comm'r of Soc. Sec. Admin,* 374 Fed.

Appx. 693, 695 (9th Cir. 2010)("[n]othing in the record suggests that [plaintiff's] ability to work was affected by his medications.").

For these reasons, the ALJ was not required to include a discussion of the side effects of Zanaflex. *See also Atchison v. Astrue,* No. 10cv1987-BAM, 2012 WL 3143871 at *12 (E.D. Cal. Aug. 1 2012) ("When no objective evidence in the record suggests that a claimant's ability to work was hampered by his or her medications, an ALJ is not required to include a discussion of side effects in the hearing decision.").  Because there is no evidence here that the side effects of Plaintiff's medications result in greater limitations than those assessed by the ALJ in Plaintiff's RFC, he did not have to specifically refer to them in his decision. *Id.*

### V. CONCLUSION

The ALJ carefully reviewed Plaintiff's disability claim, held a hearing, and conducted a thorough review of the record.   The Court finds that he provided clear and convincing reasons for discounting Plaintiff's subjective claims regarding her symptoms.  As discussed above, the ALJ identified specific evidence in the record indicating that Plaintiff's activities of daily living and the objective medical evidence were not consistent with the severity of pain alleged by Plaintiff, or with a disabling level of impairment.  The Court has reviewed the record and finds substantial evidence supporting these reasons and the ALJ's findings.  The Court therefore **DENIES** Plaintiff's Motion for Summary Judgment, affirms the decision of the Commissioner, and dismisses this action with prejudice.  The Clerk of the Court shall enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

Dated:  November 15, 2022

Hon. Nita L. Stormes
United States Magistrate Judge